United States District Court
Southern District of Texas
**ENTERED**
May 12, 2017
David J. Bradley, Clerk

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **WILFRED PADILLA[1],** | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 1:14-262** |
| | § | |
| **LORIE DAVIS,** | § | |
| **Respondent.** | § | |

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

On December 15, 2014, Petitioner Wilfred Padilla ("Padilla") filed a Petition for <u>Writ of Habeas Corpus</u> by a Person in State Custody, pursuant to 28 U.S.C. § 2254. Dkt. No. 1. On May 22, 2015, the Court stayed these proceedings to permit Padilla to exhaust his claims in state court. Dkt. No. 35.  On February 13, 2017, the stay was lifted. Dkt. No. 70.

On March 15, 2017, Respondent Lorie Davis, in her official capacity as Director of Texas Department of Criminal Justice – Correctional Institutions Division (hereinafter "Texas" or "State") filed a motion for summary judgment. Dkt. No. 73.  Padilla has filed a response and the State has filed a reply brief. Dkt. Nos. 76, 80.

After reviewing the record and the relevant case law, the Court recommends that the State's motion for summary judgment be granted.  When considered under the deferential standard of § 2254, Padilla's claims entitle him to no relief.

---

[1] Padilla's given name as been variously set forth as "Wilfred" or "Wilfredo," sometimes even in the same document. See Dkt. No. 1 (spelled "Wilfred" in the heading on page 1, but signed "Wilfredo.").  For the sake of consistency, and given that the docket reflects the petitioner's name as "Wilfred," where the petitioner's given name is required, the Court will refer to him as "Wilfred."

## I. Background

### A. Factual Background

On direct appeal, the 13th Court of Appeals of Texas made a number of specific factual findings. Padilla v. State, No. 13-12-00007-CR, 2013 WL 9680865, at *1-5 (Tex. App. Oct. 24, 2013) (unpubl.).  As provided by law, the court sets forth and adopts those findings.[2] Thus, all of the facts, as set forth below, are quoted from the State Court of Appeals decision, changing only the formatting.

In the early morning hours of August 18, 2005, investigators unearthed Jo Ann Chavez's skeletal remains inside of a shallow, oval-shaped pit of dirt nearly two years after she went missing from a Harlingen, Texas mall. The State alleged that Jo Ann's death was the result of a hit ordered by Padilla, who served as the South Texas captain of the prison gang known as the Mexican Mafia.

### 1. Jo Ann's Life with the Mexican Mafia

Witnesses described Jo Ann as an outgoing and happy person, who got mixed up with the wrong crowd, including Padilla. Her association with Padilla and other members of the Mexican Mafia eventually led Jo Ann to Ohio in 2002, where she aided in the gang's cocaine-distribution operations. Jo Ann's mother, Maria de la Luz Castañeda, testified that sometime after Jo Ann's move to Ohio, she was worried about her daughter living in Ohio, and she expressed her concerns to Padilla.  Castañeda testified that Padilla took her concerns as an insult and told her not to disrespect him because he could make "one phone call" to take care of her.  Castañeda also recalled one incident in which Padilla called her husband to tell him that Jo Ann was "talking too much," which was taken by the family as a threat against Jo Ann by Padilla.

---

[2] The Court notes that any factual findings made by the state court are "presumed to be correct," unless the petitioner can show "by clear and convincing evidence" that they were incorrect. Norris v. Davis, 826 F.3d 821, 827 (5th Cir. 2016), cert. denied, 137 S. Ct. 1203, 197 L. Ed. 2d 250 (2017) (citing 28 U.S.C. § 2254(e)(1)).  Padilla has raised no such challenge. Indeed, Padilla has not challenged the facts as found by the state court, but only the application of the law to those facts.  Accordingly, the Court adopts the factual findings of the state court.

Oscar Esteban Salazar, a former Mexican Mafia lieutenant under Padilla, testified that Padilla began to show a disdain for Jo Ann after Jo Ann and Padilla's live-in girlfriend at the time, Angelita "Angie" Ontiveros, began to argue about which one of them was dating the "main man" of the cocaine-distribution operation in Ohio. Ontiveros, who also testified at trial, is Jo Ann's sister. Salazar stated that Padilla did not like the two of them arguing and told Jo Ann to "shut the fuck up" during one argument. Salazar recalled another incident in which Padilla ordered Salazar to fly to Ohio, pick up Jo Ann, and bring her back to the Rio Grande Valley because she was "causing tides in the water." Salazar elaborated that Padilla was referring to an incident in which Jo Ann got drunk at a party and discussed "things that [she was not] supposed to be talking about." Salazar complied with Padilla's request and brought Jo Ann back to the Rio Grande Valley from Ohio.

Ontiveros testified that upon her sister's return to Harlingen, Jo Ann appeared "malnourished" and "very skinny" and described her demeanor as "bad." Salazar testified that once Jo Ann moved back to the Valley, Padilla's contempt for Jo Ann continued to grow. Ontiveros testified that prior to Jo Ann's disappearance, she witnessed Padilla and his fellow Mexican Mafia associates meet at their home, when she overheard someone say that Jo Ann was "fucking up" or that she "fucked up," and "something had to be done." Ontiveros testified that Padilla asked her to bring a photo of Jo Ann to him that day, or took away a photo of Jo Ann from her. Padilla then showed the picture of Jo Ann to the other members of the meeting. According to Ontiveros, she told Jo Ann to stay away from Padilla and the other members because they were talking about her. Graciano "J.R." Castañeda, who was the father of Jo Ann's two children and also knew Padilla, testified that Padilla had told him prior to Jo Ann's disappearance that Jo Ann had been seen with a Texas Department of Public Safety officer in McAllen and that allegation had upset Padilla.

According to Salazar, Padilla had "constant complaints" about Jo Ann, and one incident in particular was "the straw that broke the camel's back." Salazar stated that Jo Ann attempted to set up a marijuana deal between the Mexican Mafia and a rival prison gang, the Texas Syndicate. Salazar testified that the Mexican Mafia does not deal with other prison

3

gangs, and after that incident, Padilla told him that Jo Ann needed "to be dealt with." According to Salazar, "dealt with" meant that Jo Ann was going to be murdered.

### 2. The "Camello" to Kill Jo Ann

Luis Carlos "Wicho" Mares, a former sergeant and enforcer for the Mexican Mafia under Padilla, also testified. Mares provided the jury with a description of the Mexican Mafia's criminal enterprises and organizational structure, including the concept of a "camello." According to Mares, "camellos" are assignments that are delegated to lower-ranking members by those with higher ranks. Typically, "camellos" were performed by a soldier who did not follow a previous order or "messed up." Mares and Salazar each testified that in November 2003, Padilla assigned the "camello" of murdering Jo Ann to Marcos Illan "Polo" Solis, a lower-level Mexican Mafia soldier who was based in Ohio.

According to Mares and Salazar, Padilla gave this "camello" to Solis because Solis owed Padilla approximately $20,000 in drug proceeds. Mares testified that Padilla did not want to kill Solis over his debt because Solis made Padilla a lot of money from drug sales in Ohio and Michigan. Instead, Padilla ordered Solis to perform this "camello" in exchange for wiping his debt clean. Salazar testified that Padilla also ordered that Jo Ann be buried somewhere in the Harlingen area. Padilla instructed Salazar to send Mares along with Solis to ensure that the job was completed. Mares also corroborated this fact in his testimony and stated that Padilla ordered him to kill Solis if Solis did not complete his "camello."

Sara Almaguer Ortega, Solis's girlfriend at the time of Jo Ann's murder, testified that she picked up Solis from the Harlingen airport after he flew in from Ohio sometime in November 2003. Ortega testified that Solis lived in Ohio at the time, while she attended college at Texas State Technical College in Harlingen. At that time, Ortega drove a Toyota Camry owned by Solis's mother. While spending time in Harlingen, Solis drove the Camry and dropped Ortega off for classes at Texas State Technical College. According to Ortega, Solis told her one morning that he was going to meet Jo Ann at the Harlingen mall.

Norma Cano, Jo Ann's friend, testified that she last spoke to Jo Ann at eight o'clock in the morning on November 17, 2003. The two friends agreed to meet later that day, after

Jo Ann dropped her brother off at a job interview. Cano testified that Jo Ann never showed up as agreed, so Cano called Jo Ann on her cell phone. Jo Ann told Cano that she was at the mall with someone named "Polo," and that she would call her back later. Jo Ann called Cano again that afternoon around five o'clock and told Cano that she was going to Raymondville. Cano never heard from Jo Ann again.

Mares testified that he was informed on November 17, 2003 that Solis had located Jo Ann in Harlingen. After learning this, Mares picked up Bernardo "Bernie" Cortez, a Mexican Mafia solider, and Jesus "Cricket" Gonzalez, a prospective member, and drove to Mexican Mafia sergeant Manuel "May" Alonzo Trevino's house in Willacy County. Padilla asked Treviño to pick the site of Jo Ann's murder. Once Mares arrived at the burial site with Cortez, Gonzalez, and Treviño, the men discovered Solis with Jo Ann in tow.

Mares testified that Jo Ann's feet and hands were duct taped to ensure that she would not escape. "Here is the bitch that tried to ... fuck us," Mares recalled Solis telling him at the scene. Then, Solis hit Jo Ann on the left side of her face, under her eye, with a .40 caliber pistol. Mares recalled that Jo Ann's face started to bleed, and she fell to the ground. On the floor, Jo Ann began to cry and pleaded with Solis. Mares recalled Jo Ann telling Solis, "Please don't kill me. Don't kill me. Do it for my little girls." At that point, Solis began to beat Jo Ann, while Gonzalez joined him. According to Mares, Gonzalez stomped on Jo Ann's head, while Solis hit her with his .40 caliber pistol. Mares testified that one of Solis's attempts to hit Jo Ann accidentally struck the body of Solis's car, instead. At that point, Solis dragged Jo Ann to the front of car, got on top of her, and began to strangle her with his bare hands. As Jo Ann resisted, Gonzalez held her legs down. Once she died, the team dug a hole and buried her body. After the burial, Mares stated that they drove to Treviño's house to wash the mud off of their clothes and shoes and drove back to Salazar's house in Alamo to relay the message that the "camello" had been fulfilled. Salazar testified that Solis reported to him that Jo Ann was murdered, and Salazar then notified Padilla. At that point, Padilla cleared Solis's debt to him. Before everyone went home that night, the gang drank beer at Salazar's home.

Mares testified that Solis and Gonzalez returned to Jo Ann's grave the following day because Jo Ann's body had floated to the surface due to heavy rainfall from the night before. To prevent this from reoccurring, Mares stated that Solis and Gonzalez placed heavy bricks and stepping stones on top of her body.

### 3. Investigation into Jo Ann's Disappearance and Death

Harlingen Police Officer Alfredo Alvear initially investigated Jo Ann's disappearance in November 2003 with the assistance of Texas Department of Public Safety Ranger Victor Escalon. According to Officer Alvear, tips lead him to Ortega, who was Solis's girlfriend at the time. Ortega and Solis were uncooperative with the investigation, so the case went cold. A break in the case came in 2005, when Mares cooperated with investigators. Mares, who was incarcerated at the time in Huntsville, Texas was flown to Harlingen to assist investigators in finding Jo Ann's body. Ranger Escalon testified that Mares took investigators to Raymondville, Texas where Treviño lived, and then to a remote field. According to Ranger Escalon, Mares pointed out a "circular crack in the ground" that was oval-shaped and looked sunken. Because it was dusky when the discovery was made, investigators opted to secure the area and return the next morning to begin digging. Ranger Escalon testified that Mares did not attend the next day's excavation.

After the dig commenced, investigators discovered four red circular stepping stones on top of skeletal remains, two or three feet into the ground. Ranger Escalon testified that the discovery of the stones and bones corroborated what Mares told investigators. Ranger Escalon observed that remnants of clothes were also found in the grave, including the victim's undergarments.

Former Cameron County Forensic Pathologist Dr. Marguerite V. DeWitt assisted investigators at the scene with the collection of the bones. The unidentified remains were bagged and taken to Valley Baptist Medical Center in Harlingen for further examination by Dr. DeWitt. Dr. DeWitt eventually performed an autopsy of the remains and noted that the bones indicated that the remains were that of a female's and revealed fractures to: (1) the right side of the face, including the eye rim; (2) cheekbone and upper left jaw; (3) the hyoid

6

bone in the neck; and (4) several ribs. According to Dr. DeWitt, the victim died as a result of homicidal violence with evidence of blunt force trauma to the head, neck, and chest. Federal Bureau of Investigation forensic examiner John E.B. Stewart assisted with the DNA identification of the remains. According to Stewart, he compared a DNA profile from the skeletal remains alongside DNA from a buccal swab that belonged to Maria Castañeda, Jo Ann's mother. Stewart testified that the DNA profiles matched and that such a match would appear in less than one percent of the Hispanic population.

During his later investigation, Ranger Escalon located the vehicle that Solis drove on the date of Jo Ann's disappearance, and photographed and took an imprint of a dent on the passenger side of the vehicle that was consistent with Mares's pistol-whipping story.

Former Mexican Mafia member turned government informant, Paul Ramirez, also testified. The record indicates that Ramirez was not involved with Jo Ann's murder, but was an acquaintance of Padilla's in 2005. Ramirez also knew Padilla's lieutenant, Salazar, but did not know Solis. According to Ramirez, Padilla told him that he was having issues with Jo Ann dating a Drug Enforcement Agency agent in Ohio. Ramirez further testified that he learned through his discussions with Padilla that Padilla had ordered Salazar, not Solis, to murder Jo Ann. Ramirez contended, however, that Padilla later back-tracked his story and denied it.

### 4. Padilla's Indictment and Trial

In 2010, a Willacy County grand jury indicted Padilla for one count of capital murder, a capital felony, see TEX. PENAL CODE ANN. § 19.03 (West 2011), related to Padilla's alleged murder-for-hire plot with Solis; and one count of engaging in organized criminal activity. See id. § 71.02. For security purposes, the trial court granted the State's motion to change venue from Willacy County to Cameron County. After the venue change, the State expressed its intent to seek the death penalty against Padilla. Before trial, Padilla filed three motions challenging the constitutionality of the death penalty, which were all denied by the trial court.

After a two-week trial[3], the jury returned a guilty verdict as to Count I for the lesser-included offense of murder, a first-degree felony, see id. § 19.02(b), and guilty as charged as to Count II, engaging in organized criminal activity. As a result, the State abandoned its intent to seek the death penalty and, instead, sought life imprisonment for both charges. During the punishment phase, the jury assessed Padilla's punishment at: fifty years' imprisonment at the Texas Department of Criminal Justice–Institutional Division for Count I; and thirty years' imprisonment for Count II. The trial court further ordered that Padilla's sentences be served consecutively with the federal prison sentence that he was serving at the time of trial.[4]

### 5. Direct Appeal

On direct appeal, Padilla – via appointed counsel – raised five issues: (1) the testimony of Padilla's accomplices lacked corroboration, in violation of TEX. CODE CRIM. PROC. § 38.14; (2) the Texas capital punishment statute is unconstitutional; (3) the Court erred by not declaring a mistrial after a government witness invoked his Fifth Amendment rights on the witness stand in front of the jury; (4) testimony from a confidential informant lacked corroboration; and (5) testimony from a prison informant lacked corroboration. Padilla, No. 13-12-00007-CR, 2013 WL 9680865, at *1-5 (Tex. App. Oct. 24, 2013) (unpubl.).

On October 24, 2013, the 13th Court of Appeals issued an opinion, affirming Padilla's conviction. Id. As to the first and fifth issues, the Court of Appeals held that the non-accomplice testimony in the case sufficiently implicated Padilla in the murder. Id. As to the second issue, the Court of Appeals held that any claims regarding the death penalty were mooted by the jury's rejection of the capital murder charge. Id. As to the third issue, the Court of Appeals found that the Court did not err in allowing the witness to take the stand

---

[3] This court notes that, at trial, Solis was held in contempt of court for his refusal to testify against Padilla. This issue will be explained and explored in greater depth later in this report and recommendation.

[4] The direct quotation of facts, taken from the 13thCourt of Appeals, ends here.

and that any error was ultimately harmless. Id.  As to the fourth issue, the Court of Appeals held the statute regarding confidential informant testimony was inapplicable to this case. Id.

On December 19, 2013, Padilla, acting pro se, filed a petition for discretionary review with the Texas Court of Criminal Appeals. Dkt. No. 31-41, p. 15643.[5]  In his petition, Padilla re-urged four of his five claims that were previously raised: (1) the trial court erred in denying his motion for a directed verdict on the grounds that there was insufficient evidence – outside of uncorroborated accomplice testimony – to sustain his conviction; (2) the trial court erred when it denied his motion for a mistrial when the State called a witness, knowing that the witness would invoke the Fifth Amendment; (3) the trial court erred in denying his motion for a directed verdict on the grounds that there was insufficient evidence – outside of the use of uncorroborated confidential informant testimony – to sustain his conviction; and (4) the trial court erred in denying his motion for a directed verdict on the grounds that there was insufficient evidence – outside of the use of uncorroborated jailhouse informant testimony – to sustain his conviction. Id, p. 15644.

On February 5, 2014, the Texas Court of Criminal Appeals "refused" Padilla's petition for discretionary review. Dkt. No. 31-35, p. 15563.  A "refusal" disposition means that the Texas court declined to consider the case. Sheffield v. State, 650 S.W.2d 813, 814 (Tex. Crim. App. 1983).

### 6. State Habeas Proceedings

On November 21, 2014, Padilla wrote to the Cameron County District Clerk's Office, seeking a form for a state writ of habeas corpus petition. Dkt. No. 11.  On December 12, 2014, the state district judge wrote "request denied" on Padilla's correspondence. Id.

On December 14, 2014, Padilla filed a federal habeas petition in this Court. Dkt. No. 1.

On May 22, 2015, the Court stayed proceedings in this case to permit Padilla to

---

[5] The page numbers refer to the Bates-stamped number at the bottom of each page of the record.

exhaust his claims in state court. Dkt. No. 35.

On July 1, 2015, Padilla filed a state <u>habeas</u> petition in Cameron County. Dkt. No. 55-1, p. 15713.  In that petition, Padilla raised five claims, which the Court restates as the following two claims: (1) ineffective assistance of appellate counsel, because counsel raised meritless arguments and failed to raise meritorious ones supported by the record; (2) the Texas courts violated the United States Constitution, by not allowing Padilla to fire his appointed appellate counsel. <u>Id</u>.

On August 4, 2015, the 197th District Court in Cameron County filed findings of fact and a recommendation to the Court of Criminal Appeals. Dkt. No. 55-1, p. 15760.  The 197th District Court found that the <u>habeas</u> petition should have been filed in Willacy County and recommended to the Court of Appeals that the petition be dismissed without prejudice to refiling in Willacy County. <u>Id</u>.

On October 21, 2015, the Court of Criminal Appeals "denied" Padilla's petition "without [a] written order." Dkt. No. 55-2, p. 15867.  The denial signified that the Appeals Court had considered the merits of Padilla's petition and found that relief was not warranted. <u>Ex parte Torres</u>, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997) (en banc).

Padilla then re-filed his <u>habeas</u> petition in Willacy County. Dkt. No. 65.  On December 8, 2016, the 197th District Court – sitting in Willacy County – dismissed his petition, finding that the "denial" by the Court of Criminal Appeals decided Padilla's petition, thereby "moot[ing]" the petition filed in Willacy County. <u>Id</u>.  It appears that the District Court found that the new petition was barred by <u>res judicata</u>.

### B. Procedural History

On December 15, 2014, while the various state petitions were proceeding, Padilla filed his <u>habeas</u> petition, pursuant to 28 U.S.C. § 2254, in this Court. Dkt. No. 1

In that petition, Padilla raised nine claims, which the Court restates and re-numbers as six claims: (1) the testimony of his accomplices lacked sufficient corroboration; (2) the testimony of a confidential informant lacked sufficient corroboration; (3) testimony of a jailhouse informant lacked sufficient corroboration; (4) the trial court should have declared

a mistrial, after a government witness invoked the Fifth Amendment on the stand in front of the jury; (5) ineffective assistance of counsel on direct appeal, because counsel raised meritless issues and failed to raise meritorious ones supported by the record; and (6) the state appellate court erred in not holding hearing on Padilla's motion to remove appointed counsel.

As set out earlier, the Court stayed the instant case on May 22, 2015, to permit Padilla to exhaust his claims in state court. Dkt. No. 35.  Padilla then filed his state habeas petition, which was denied. Dkt. No. 55-2, p. 15867.  On February 13, 2017, the Court lifted the stay in the instant case. Dkt. No. 70.

On March 15, 2017, the State filed a motion for summary judgment. Dkt. No. 73.  As to the first three claims, the State argues that those issues were decided on independent state law grounds, for which reason this Court lacks the "authority" to consider those claims.  As to the remaining three claims, the State argues that Padilla's claims are meritless and were correctly decided by the state courts. Id.

On April 10, 2017, Padilla filed a reply brief. Dkt. No. 76.  On April 20, 2017, Texas filed a response brief. Dkt. No. 80.[6]  On May 4, 2017, Padilla filed a "traverse" to the State's reply brief. Dkt. No. 83.  The traverse was filed in contravention of the Court's order that no further briefing would be permitted (Dkt. No. 78).  Because it was improperly filed, it was not considered in deciding this case.[7]

## II. Applicable Law

### A. Summary Judgment

Summary judgment pursuant to Rule 56(c) is appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

---

[6] Padilla has filed numerous motions in this case. Dkt. Nos. 34, 74, 75, 82.  The Court recommends that each of these motions be denied, given that Padilla's claims are ultimately meritless.

[7] Even if the substance of the submission, which is best characterized as a surreply, was considered, it does not change the lack of merit in all of Padilla's claims.

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences are made and doubts are resolved in favor of the nonmoving party.  Dean v. City of Shreveport, 438 F.3d 448, 454 (5th Cir. 2006).  Hearsay is not competent summary judgment evidence.  Martin v. John W. Stone Oil Distributor, Inc., 819 F.2d 547, 549 (5th Cir. 1987).

A court may determine that no genuine issue of material fact exists, if it determines that no reasonable juror could find in favor of the nonmovant.  Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1089 (5th Cir. 1995).  The moving party, however, is not required to provide evidence negating the nonmovant's claims.  Celotex Corp., 477 U.S. at 323.  "[R]egardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for entry of summary judgement, as set forth in Rule 56(c), is satisfied."  Id.  Summary judgment is an appropriate vehicle through which to resolve a habeas petition, where the facts otherwise support such resolution. Goodrum v. Quarterman, 547 F.3d 249, 255 (5th Cir. 2008).

### B. Section 2254

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a prisoner convicted in a state court may challenge his conviction to the extent it violates "the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Accordingly, only violations of the United States Constitution or federal law are subject to review by this Court under § 2254.

In conducting such a review, a federal district court:

> may not issue a writ of habeas corpus for a defendant convicted under a state judgment unless the adjudication of the claim by the state court "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding."

Riddle v. Cockrell, 288 F.3d 713, 716 (5th Cir. 2002) (quoting 28 U.S.C. § 2254(d)(1)-(2)).

"A decision is contrary to clearly established federal law under § 2254(d)(1) if the state court (1) 'arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law'; or (2) 'confronts facts that are materially indistinguishable from a relevant Supreme Court precedent' and reaches an opposite result.'" Simmons v. Epps, 654 F.3d 526, 534 (5th Cir. 2011) (quoting Williams v. Taylor, 529 U.S. 362, 405 (2000)).

"The state court makes an unreasonable application of clearly established federal law if the state court (1) 'identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts'; or (2) 'either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" Simmons, at 534 (quoting Williams, at 407).

Additionally, the AEDPA requires that federal law be "clearly established" "as articulated by the Supreme Court." Woodfox v. Cain, 609 F.3d 774, 800 n. 14 (5th Cir. 2010). "[A] decision by . . . [the Fifth Circuit] . . . or one of our sister circuits, even if compelling and well-reasoned, cannot satisfy the clearly established federal law requirement under § 2254(d)(1)." Salazar v. Dretke, 419 F.3d 384, 399 (5th Cir. 2005).

Furthermore, a federal court may not review a state court's determination of state law issues. Thompson v. Thaler, 432 F. App'x 376, 379 (5th Cir. 2011); McCarthy v. Thaler, 482 F. App'x 898, 903 (5th Cir. 2012). "Under § 2254, federal habeas courts sit to review state court misapplications of federal law. A federal court lacks authority to rule that a state court

incorrectly interpreted its own law." <u>Charles v. Thaler</u>, 629 F.3d 494, 500–01 (5th Cir. 2011) (emphasis original). "It is not our function as a federal appellate court in a <u>habeas</u> proceeding to review a state's interpretation of its own law, and we defer to the state courts interpretation of the Texas ... statute." <u>Schaetzle v. Cockrell</u>, 343 F.3d 440, 449 (5th Cir. 2003) (quoting <u>Weeks v. Scott</u>, 55 F.3d 1059, 1063 (5th Cir. 1995)).

### C. Ineffective Assistance

To establish ineffective assistance of counsel, a petitioner must demonstrate: (1) that his counsel's performance was objectively unreasonable, rendering it deficient; and (2) that the deficient performance prejudiced the defendant. <u>Strickland v. Washington</u>, 466 U.S. 668, 689-94 (1984). To merit relief, the petitioner must meet both prongs. Id. In contrast, "a court need not address both prongs of the conjunctive <u>Strickland</u> standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test." <u>Amos v. Scott</u>, 61 F.3d 333, 348 (5th Cir. 1995).

To satisfy the first prong, the petitioner must establish that counsel's performance was deficient. "[T]he proper measure of attorney performance is reasonableness under prevailing professional norms." <u>U.S. v. Molina-Uribe</u>, 429 F.3d 514, 519 (5th Cir. 2005). Courts will not "audit decisions that are within the bounds of professional prudence." <u>Id</u>. at 518. To warrant relief, because of ineffective assistance of counsel, counsel's performance must be so deficient that it "renders the result of the . . . proceeding fundamentally unfair." <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 372 (1993).

Even if counsel's performance was deficient, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test . . . and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." <u>Strickland</u>, 466 U.S. at 693 (internal citation omitted). A petitioner must establish that the error prejudiced the outcome of his trial. A petitioner establishes prejudice where he proves "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. To merit relief, the

14

petitioner must show an error that undermines confidence in the reliability of the verdict. Id. "[A]ny amount of actual jail time has Sixth Amendment significance." Tutt v. Cockrell, 273 F.3d 1107 (5th Cir. 2001).

Furthermore, establishing that "a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult." Richter, 131 S.Ct. at 788. "Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id. (emphasis added). Thus, the question is whether the state court was unreasonable in its resolution of the issue presented, not whether the state court may have been wrong.

"[R]eview of the state court's resolution of . . . [an] ineffective-assistance-of-counsel claim is doubly deferential . . .since the question is whether the state court's application of the Strickland standard was unreasonable." Druery v. Thaler, 647 F.3d 535, 539 (5th Cir. 2011) (internal quotations and citations omitted). In order to succeed on a § 2254 habeas claim based on ineffective assistance of counsel, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id.

Furthermore, a defendant is entitled to effective assistance of counsel on direct appeal. Lombard v. Lynaugh, 868 F.2d 1475, 1479 (5th Cir.1989). "Where an attorney failed to adequately brief an issue on direct appeal, appellant must show initially that the appeal would have had, with reasonable probability, a different outcome if the attorney adequately addressed the issue." U.S. v. Dovalina, 262 F.3d 472, 474–75 (5th Cir. 2001).

### III. Analysis

In analyzing Padilla's claims, a basic premise is that allegations by pro se litigants must be afforded liberal construction to ensure that their claims are not unfairly dismissed, because of their unfamiliarity with the law. Haines v. Kerner, 404 U.S. 519, 520 (1972).

That latitude, however, "does not exempt a party from compliance with relevant rules of procedural and substantive law." Birl v. Estelle, 660 F.2d 592, 593 (5th Cir. 1981). In this case, even allowing for the latitude due a pro se, Padilla's claims are meritless and should be denied.

As observed earlier, Padilla has raised six claims: (1) the testimony of his accomplices lacked sufficient corroboration; (2) testimony of a confidential informant lacked sufficient corroboration; (3) testimony of jailhouse informant lacked sufficient corroboration; (4) trial court should have declared mistrial after a government witness invoked the Fifth Amendment;(5) ineffective assistance of counsel on direct appeal, because counsel raised meritless issues and failed to raise meritorious ones supported by the record; and (6) the state appellate court erred in not holding hearing on Padilla's motion to remove appointed counsel. The Court will address three first claims together and then will address the remaining claims individually.

### A. Corroboration

Padilla asserts that the testimony of his accomplices, the confidential informant, and the jailhouse informant, were not sufficiently corroborated under Texas law. The Court lacks the authority to consider these claims.

Texas law establishes that a defendant may not be convicted solely on the testimony of accomplices, confidential informants, or jailhouse informants. See TEX. CODE CRIM. PROC. § 38.14 (accomplices); § 38.141 (confidential informants)[8]; § 38.075 (jailhouse informants). In order to overcome this limitation, the State must corroborate the testimony of any such witnesses with evidence that "tends to connect" the defendant to the crime. Id. Such evidence does not need to be sufficient – standing alone – to convict the defendant, but must merely be circumstantial evidence of the defendant's involvement. Trevino v. State, 991

---

[8] The Texas appellate court found that this statute did not apply to the confidential informant testimony in this case, because this statute only applies to violations of the state health code. Padilla v. State, No. 13-12-00007-CR, 2013 WL 9680865, at *13 (Tex. App. Oct. 24, 2013). Because this ruling was an interpretation of state law, the Court lacks the authority to review it. Charles, 629 F.3d at 500–01.

S.W.2d 849, 851 (Tex. Crim. App. 1999) (en banc).  The Court notes that this corroboration rule is a "statutorily imposed review and is not derived from federal or state constitutional principles that define the legal and factual sufficiency standards." Malone v. State, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008).  In other words, this standard is not mandated by the U.S. Constitution, but is a statutorily-created state requirement. Id.

All of Padilla's arguments regarding these claims rest on state law grounds – namely that the State failed to meet the evidentiary burden established by Texas state law.  It is well-settled law that a federal court may not review a state court's interpretation and determinations of state law. See Thompson, 432 F. App'x at 379 (federal court "must defer" to the state court's determination on state law evidentiary issues); McCarthy, 482 F. App'x at 903 ("a federal habeas court cannot overrule" a state court's ruling on state law).

Thus, all of these claims should be denied because they are not cognizable on federal habeas review.[9]

### B. Invocation of the Fifth Amendment

Padilla asserts that the trial court should have declared a mistrial after Solis – who was convicted of murdering Jo Ann Chavez – invoked the Fifth Amendment while on the witness stand.  As applicable here,  the state courts did not act unreasonably by rejecting this claim.

At the time of Padilla's trial, Solis had already been convicted of Jo Ann Chavez's murder. Dkt. No. 29-24, pp. 13333-34.  Furthermore, there was a letter from the United States Attorney for the Western District of Michigan placed into the record, indicating that Solis was not going to be prosecuted by that office. Id., pp. 13338-39.  The trial court found that Solis could not invoke the Fifth Amendment at Padilla's trial, given that he was not

---

[9] Even if these claims were cognizable on federal habeas review, it would avail Padilla nothing.  "When evaluating the sufficiency of corroboration evidence under the accomplice-witness rule, we eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the offense." Cerna v. State, 441 S.W.3d 860, 864–65 (Tex. App. 2014); Ruiz v. State, 358 S.W.3d 676, 680 (Tex. App. 2011) (same standard for jailhouse informant). The state court was not unreasonable in determining that there was sufficient circumstantial evidence that tended to connect Padilla to Jo Ann Chavez's murder.

under threat of further prosecution. Id, pp. 13350-51.

When the State announced its intention to call Solis to the stand, defense counsel objected and a hearing was held outside of the presence of the jury. Dkt. No. 29-24, pp. 13333-60.  Solis's counsel was present and informed the Court that Solis would plead the Fifth Amendment, even if the Court held that the Fifth Amendment was inapplicable to Solis. Id., pp. 13333-38.  Solis's counsel noted that the letter only appeared to immunize Solis in the Western District of Michigan and was not a "blanket" letter of immunity from the Justice Department. Id., pp. 13345-46.

The trial court held that Solis could not invoke the Fifth Amendment and ordered him to testify. Dkt. No. 29-24, pp. 13359-60.  When called to the witness stand, Solis informed the Court that he would continue to invoke his Fifth Amendment rights. Id, pp. 13361-62.  At that point, the Court held Solis in contempt for refusing to testify and ordered him to serve 180 days in prison, to be served consecutively to his sentence for murdering Chavez. Id.  Thus, Solis would serve his contempt sentence after his murder sentence was completed. Dkt. No. 25-7, p. 3221.

After the Court held Solis in contempt, it permitted the prosecutor to question Solis, over the objection of defense counsel. Dkt. No. 29-24, p. 13363.  The prosecutor asked Solis, "Is your name Marcos Illan Solis?" Dkt. No. 29-24, p. 13364.  When Solis did not respond, the prosecutor asked Solis, "Again, sir, is your name Marcos Illan Solis?" Id.  When no response was given, the prosecutor asked, "Are you the same Marcos Illan Solis that is a member of the Mexican Mafia?" Id.  After Solis remained silent, the prosecutor asked, "And that was a soldier under the reign of Captain Willie Padilla of the Mexican Mafia of the Rio Grande Valley?" Id.

At that point, the prosecution discontinued its questioning and Solis was held in contempt of court. Dkt. No. 29-24, pp. 13366-67.[10]

---

[10] The Court notes that as a result of this ruling, the State was allowed to introduce into evidence statements made by Solis during his guilty plea allocution. Dkt. No. 25-21, pp. 3900-03.  Padilla did not raise any claim – in his state habeas proceedings – that the introduction of this evidence violated his Sixth Amendment right to confront Solis or that appellate counsel

Padilla asserts that the State committed misconduct by questioning Solis on the stand, after Solis had already declared his intentions to invoke the Fifth Amendment. The problem with seeking relief for such an alleged error is that there is a lack of clearly established Supreme Court precedent to establish the effect of such an act.

The issue of whether "a defendant's rights under the Due Process and Confrontation Clauses are violated when the Government forces a witness to take the stand solely to invoke his privilege against self-incrimination in front of the jury even though the Government already knew that the witness would refuse to testify" has not been resolved by the Supreme Court. Lindsey v. U.S., 484 U.S. 934 (1987) (White, J., dissenting from denial of certiorari).

In Lindsey, the Supreme Court declined to decide the issue, even though there was – and continues to be – a split between the circuit courts. Id.; compare, e.g., U.S. v. Vandetti, 623 F.2d 1144, 1147 (6th Cir. 1980) (government may call witness who plans to invoke Fifth Amendment rights, if failing to do so would prejudice government's case) and U.S. v. King, 461 F.2d 53, 57, and n. 4 (8th Cir. 1972) (prejudice from calling such a witness could not be ameliorated with a curative instruction).

As such, there is no clearly established Supreme Court precedence for the Court to rely upon. It appears to be axiomatic that a state court's decision cannot be contrary to clearly established Supreme Court precedent, if no such precedent exists. Salazar v. Dretke, 419 F.3d 384, 404 (5th Cir. 2005).

Furthermore, the Supreme Court has held that the Government's questioning a witness, who invokes the Fifth Amendment on direct examination, is reversible error in only two circumstances: (1) "when the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege;" and (2) when

---

should have raised this argument on direct appeal. See Dkt. No. 55. pp. 15713-49. While Padilla made this argument in a memorandum of law filed in this case – Dkt. No. 57, p. 16 – his failure to raise the claim in the state courts means that the claim is unexhausted. Rocha v. Thaler, 626 F.3d 815, 820 (5th Cir. 2010). Unexhausted claims are procedurally defaulted and cannot be considered by this Court. Id. Accordingly, the Court will not consider Padilla's argument as to this claim.

"in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." Namet v. U.S., 373 U.S. 179, 186 (1963). The first situation appears to be inapplicable to this case. As to the second situation, the state appellate court was not unreasonable in its determination that any such error was harmless, because all of the questions asked by the prosecution were cumulative of testimony from other witnesses.

Thus, this claim should be denied.

### C. Ineffective Assistance of Appellate Counsel

Padilla argues that his appellate counsel was ineffective because he raised meritless issues on appeal and failed to raise meritorious ones supported by the record. This claim should be denied.

As previously noted, a defendant is entitled to effective assistance of counsel on direct appeal. Lombard, 868 F.2d at 1479. Ineffective assistance of appellate counsel can take three forms: (1) failing to raise a meritorious argument on appeal; (2) failing to effectively argue a meritorious issue; and, (3) abandoning the defendant in such a way that he has been constructively denied an appeal. Penson v. Ohio, 488 U.S. 75, 88 (1988). The third possibility – constructive denial of an appeal – does not appear to be present in this case.

#### 1. Raising Meritless Arguments

As to the claims that his counsel argued meritless issues on appeal – such as the constitutionality of the death penalty statute when the death penalty was not imposed in this case – Padilla cannot establish prejudice. While appellate counsel may be deficient by arguing clearly meritless issues on appeal, that failure does not automatically establish prejudice. A recent Fifth Circuit decision sheds light on this issue.

In Vollmer v. Davis, No. 14-10301, 2016 WL 7403061 (5th Cir. Dec. 20, 2016), defendant's counsel had argued on appeal that the conviction should be overturned because the defendant was not informed of the immigration consequences of his guilty plea. Id., 2016 WL 7403061, at *5. It was clearly established at the time of the conviction that the defendant was born in the United States, so this argument was "wholly irrelevant" to the case. Id. The

Fifth Circuit found that counsel's representation "fell below an objective standard of reasonableness," but also found that the defendant was not prejudiced, because the record did not establish that there were potentially successful lines of argument that counsel failed to employ. Id. In other words, a defendant is only prejudiced by appellate counsel's meritless arguments if the case contained meritorious arguments that counsel failed to raise.

As such, Padilla's claims, about raising arguments that should not have been made and failing to raise arguments that should have been made, are intertwined. Because he has failed to establish the unraised arguments that had merit, the raising of non-meritorious arguments is of no effect.

### 2. Prosecutorial Misconduct

Padilla also argues that his appellate counsel was ineffective for failing to argue "prosecutorial misconduct." According to Padilla, the State knowingly procured perjured testimony; withheld exculpatory evidence; and, utilized an improper closing argument. Dkt. No. 1.

### a. Perjured Testimony and Withholding Evidence

As to the first two claims – use of perjured testimony and withholding of exculpatory evidence – Padilla cites to no evidence in the record to support these claims. Instead, he raises conclusory claims of prosecutorial misconduct. "Conclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding." Miller v. Johnson, 200 F.3d 274, 282 (5th Cir. 2000). Given that these claims are completely unsupported in the record, they should be denied.

### b. Improper Closing Argument

As to the third claim – improper argument – Padilla refers to the closing argument, when the prosecutor said, "This process has to go a jury, it has to go the community, and we are asking you to join with us as part of law enforcement." Dkt. No. 29-27, pp. 13607-09. At that point, defense counsel objected and argued that the prosecutor was improperly "asking the jury to walk with law enforcement in this case." Id. The trial court denied the objection. Id. The prosecutor then added that "the plea of law enforcement, ladies and gentlemen, is we have our structure that we make. We have our rules. We are asking you

to uphold that structure and those rules and tell him that his structure and his rules, there is no room for that."[11] Id.

Padilla argues that his appellate counsel was deficient for failing to raise on appeal a claim of prosecutorial misconduct. Despite this concern, the salient question is whether counsel's performance fell below the established standard for effective assistance claims, under § 2254. In other words, the question is "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Richter, 562 U.S. at 105. "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Clark v. Thaler, 673 F.3d 410, 418 (5th Cir. 2012).

"A plea for law enforcement is proper argument and may take many forms, including arguments that draw on the jury verdict's impact on the deterrence of crime in general and the community at large." Acosta v. State, 411 S.W.3d 76, 94 (Tex. App. 2013). Furthermore, for an improper closing argument to be reversible error, "the comment, viewed in light of the record as a whole, must be extreme or manifestly improper, violative of a mandatory statute, or inject into the trial new facts harmful to the accused." Greer v. State, 882 S.W.2d 24, 26 (Tex. App. 1994). In making this determination, the Court must "look to the entire record of final arguments to determine if there was a willful or calculated effort on the part of the State to deprive appellant of a fair or impartial trial." Cook v. State, No. 03-98-00494-CR, 1999 WL 737782, at *2 (Tex. App. Sept. 23, 1999). Thus, in order for the improper argument claim to have succeeded on appeal, appellate counsel would have been required to show that the prosecutor's argument was "extreme or manifestly improper" in light of all of his comments, not just the snippet which specifically asked the jury to "join" with law enforcement.

---

[11] The prosecutor's call for the jury "to join with us as part of law enforcement," may well be improper. Simply stated, that is not the role of the jury in our criminal justice system. See U.S. v. Gaudin, 515 U.S. 506, 514 (1995) (jury's constitutional role is to serve as finder of fact and to draw the ultimate conclusion of guilt or innocence). That misstatement, however, is not enough to find error, given the standard applicable to review of the state court judge's overruling of the objection.

Padilla has failed to surmount the high standard set by § 2254 to establish ineffective assistance of appellate counsel on this issue. Indeed, there at least two reasonable arguments that counsel was not deficient.

The first argument is that, in light of all of the prosecutor's statements, the prosecutor's argument was not impermissible. While the prosecutor asked the jury to "join with law enforcement," his argument went on to define law enforcement as "our structure" and "our rules," – i.e. the laws of society – as opposed to joining with law enforcement agencies.

"A proper plea for law enforcement may argue the relationship between the jury's verdict and (1) the deterrence of crime in general, (2) the deterrence of specific crimes, (3) the impact it will have on the community at large, or (4) the impact it will have on narrower segments of the community (e.g., law enforcement officers, highway drivers, women, or children)." Carmen v. State, 358 S.W.3d 285, 300 (Tex. App. 2011). In this light, the prosecutor was merely arguing the relationship between the jury's verdict and the general deterrence of crime. Thus, appellate counsel could have reasonably concluded that, in light of his entire argument, the prosecutor's argument was not improper. This is not to say that the prosecutor's argument was unquestionably permissible. Instead, it is a determination that there is a reasonable argument that it was permissible. That conclusion precludes relief.

The second argument is that, even if the prosecutor's argument was improper, it would have been held to be harmless error. As previously noted, an improper argument "must be extreme or manifestly improper" in order to merit reversal. "In determining whether the error affected the defendant's substantial rights, we balance the severity of the misconduct, or its prejudicial effect, any curative measures, and the certainty of the punishment absent the argument." Rice v. State, No. 05-15-01427-CR, 2017 WL 359755, at *10 (Tex. App. Jan. 19, 2017), petition for discretionary review refused (Mar. 29, 2017).

This is a high standard. Mere isolated statements do not merit reversal. Castro v. State, No. 11-14-00095-CR, 2017 WL 922505, at *5 (Tex. App. Feb. 28, 2017) (prosecutor's "isolated" comment about defendant's criminal history, after nine days of testimony, did not impact defendant's substantial rights); McIntyre v. State, No. 03 04 00007 CR, 2005 WL

670498, at *3 (Tex. App. Mar. 24, 2005) (isolated comment that the defendant's personality was "annoying" did not impact his substantial rights).

Furthermore, in this case, the prejudicial effect of the argument would appear to be minimal.  The comment came at the end of a two week trial, with many witnesses testifying. The prosecutor's comment was not so egregious that it would have stood out to the jury as it began deliberations; nor does the record show that the comment was part of an intentional effort to have the jury consider themselves a roving police force. Cantu v. State, 939 S.W.2d 627, 633 (Tex. Crim. App. 1997) (error must be part of a "willful and calculated" effort to deprive defendant of a fair trial in order to mandate reversal).

Additionally, the Court must consider "the certainty of the punishment absent the argument." Rice, 2017 WL 359755, at *10.  This factor weighs heavily in favor of a finding that any such error was harmless.  The State produced overwhelming evidence of Padilla's guilt and there is no evidence in the record that the verdict would have been different, but for the prosecutor's argument. See Green v. State, No. 06-15-00232-CR, 2016 WL 7234071, at *4 (Tex. App. Dec. 14, 2016) ("If we disregard the State's comment, the remaining evidence was sufficient to support the jury's finding of guilt.  Therefore, even if the State's comment was error, it was harmless.").  Indeed, it does not appear that Padilla has ever claimed actual innocence.

Thus, there is a reasonable argument that appellate counsel could have decided that this argument should not be raised on appeal, because any error would have been harmless. "[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." Smith v. Robbins, 528 U.S. 259, 288 (2000).  There is a "strong presumption" that appellate counsel's decision to raise "certain issues to the exclusion of others reflects trial tactics rather than sheer neglect." Dorsey v. Stephens, 720 F.3d 309, 320 (5th Cir. 2013) (internal quotations omitted).  Given these presumptions, appellate counsel was not ineffective for failing to raise this issue on appeal.

For all of these numerous reasons, Padilla's claims of ineffective assistance of appellate counsel should be denied.

### D. Hearing On Appellate Counsel

Padilla argues that the state court erred in not holding a hearing on his motion to remove his appellate counsel while the appeal was still pending.

There is no federal law or precedent which requires the state court to inquire as to whether appellate counsel is doing an adequate job while the appeal is still pending. The Court has found none and Padilla has not pointed to any. In the absence of clearly established federal law, the Court lacks the authority to grant Padilla any relief. Salazar, 419 F.3d at 404. This claim should be denied.

## IV. Recommendation

It is recommended that the motion for summary judgment filed by Respondent Lorie Davis be granted. Dkt. No. 73. It is further recommended that Wilfred Padilla's petition for writ of habeas corpus by a person in state custody pursuant to 28 U.S.C. § 2254 be denied. Finally, it is recommended that any other outstanding motions filed by Padilla in this case be denied.

### A. Certificate of Appealability

Unless a circuit justice or judge issues a Certificate of Appealability ("COA"), a petitioner may not appeal the denial of a § 2254 motion to the Court of Appeals. 28 U.S.C. § 2253(c)(1)(A). A petitioner may receive a COA only if he makes a "substantial showing of the denial of a constitutional right." § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 336 (2003). To satisfy this standard, a petitioner must demonstrate that jurists of reason could disagree with the court's resolution of his constitutional claims or that jurists could conclude that the issues presented are adequate to deserve encouragement to proceed further. Id. at 327; Moreno v. Dretke, 450 F.3d 158, 163 (5th Cir. 2006). "Importantly, in determining this issue, we view the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)." Druery v. Thaler, 647 F.3d 535, 538 (5th Cir. 2011) (internal quotations omitted) (citing Barrientes v. Johnson, 221 F.3d 741, 772 (5th Cir.2000)). The district court must rule upon a certificate of appealability when it "enters a final order adverse to the applicant." Rule 11, Rules Governing § 2254 Petitions.

After reviewing Padilla's § 2254 motion and the applicable Fifth Circuit precedent,

the Court is confident that no outstanding issue would be debatable among jurists of reason. Although Padilla's § 2254 motion raises issues that the Court has carefully considered, he fails to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Accordingly, it is **RECOMMENDED** that a COA should be denied.[12]

### B. Notice to Parties

The parties have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Andrew S. Hanen, United States District Judge. 28 U.S.C. § 636(b)(1) (eff. Dec. 1, 2009). Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the report and shall bar the parties from attacking on appeal factual findings accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. See § 636(b)(1); Thomas v Arn, 474 U.S. 140, 149 (1985); Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

DONE at Brownsville, Texas, on May 12, 2017.

Ronald G. Morgan
United States Magistrate Judge

---

[12] The Court notes that if it were reviewing this case de novo, it likely would have granted a certificate of appealability on several issues, such as whether Solis invoking his Fifth Amendment rights required a mistrial and ineffective assistance of appellate counsel. However, given the deferential standard of review under § 2254, the Court believes that jurists of reason would not find the resolution of Padilla's claims to be debatable. Thus, it recommends denial of the issuance of a certificate of appealability.